We'll call our first and only case of today, Shuker v. Smith and Nephew, and Mr. Zajic, if you'd come forward. I'm Robert, and I'm here for Thaddeus Walter and Vivian Shuker Mag approach. Yeah, please. What's your name again, sir? Oh, I'm looking off up here. Mr. Astrachan? Yes. May it please the court, I reserve three minutes of time for rebuttal. This is an appeal from the dismissal of a product's liability action resulting from Mr. Shuker being implanted by components of two different medical devices. Mr. Shuker's out. We're well familiar with the background. I think what we would like to know right from the start is if you can help us understand what the meaning of the word device is for purposes of analysis under the FDA. Okay, sure. So I think I was looking at it and you looked at the third page of my reply. I don't know if you had it before. You can see the two different devices that are at issue here. The way that the FDA reviews devices is they won't look at a particular component and assign it a classification. They look at the device as a whole. And how do we know that? Has the FDA said that that's how they do it? Yes. I mean, you submit a particular device. In this case, there's the BHR, which was initially a cup, a liner, and a ball to be used for hip resurfacing. They reviewed the product extensively for do the testing so they got to make sure it's safe for human use. And then subsequently, this R3 liner was brought into the system as a supplement. Right. And like I said, I think we're well familiar with the facts. What we're struggling with is the argument your opponent has made that device is defined in the statute and this is something that the district court accepted and, in fact, quoted in Section 321H of Title 21. That piece of the FDCA says device includes any component or part thereof. So the R3 liner is a part or a component. Why isn't it subject to the same breadth of preemption as any other part of the system would be when we're asked to decide whether or not your claims of express warranty and negligent design, et cetera, are expressly preempted? Because that's the way they review devices. They look at the components and they assign it a classification when used for a specific purpose. When it's used outside of the purpose in combination with different components, it loses the preemptive effect. But we have not just the definition of device to include parts and components, where Congress went out of its way to do that, but the application provision at 360EC1B says the application has to contain a full statement of the components of the device, such samples of components as the FDA may require. The regulation requires a complete description of each functional component and one or more samples of the components to be submitted. Doesn't that suggest that the safety review, to the extent that that's what informs the scope and purposes of the express preemption clause, that that applies as well to the components or parts that are specifically reviewed as part of that P&A process? See, when the statute preempts devices, claims related to a device, not related to the components, that's what the specific language says. It's related to the device and not related to the component. But device is defined to include the term component or part. The statute, it could have said we preempt claims based on components and devices, but it just says devices. When something is not used as a device, it loses its preemptive effect. It's only if the device is used. And I think I pointed out that the cases that the application pointed out are different than the situation we have here because they're either a whole entire Class III device, which clearly there's nothing, how could you argue, there's not preemption as a whole Class III device. Well, Slim and Bertini are not different. They're exactly the same, right? Those two Southern District of New York cases are exactly the same, as is that District of Connecticut case, not LaFontaine, but the one that came right after it. Those are three cases from courts that are looking at specifically this R3 liner use with the R3 system instead of the VHR system and saying, hey, it's covered, it's expressly preempted. So, you know, when you say the cases, their points are different, they are three cases that are exactly the same, don't they? And I mean, those cases are with the same components, but Latterdy, which is also in the, I mean, LaFontaine, that's in Connecticut, also is the same device as Mr. Shuker, and their analysis, similar to Husky and Ethicon, is what we have put forward here, which is that there's not preemption in the scenario here where it's not. Isn't part of the industry is focused on the R3 metal center? I mean, obviously, it's the R3 metal center, but is that true? It was hard to hear everything, but I think you were asking whether the R3 metal liner is at the heart of our claims, and that's something, again, we would have to put back against. As I was trying to discuss a little bit earlier, the way it works is that there's a cup and a ball, and then there's a liner in the middle. You can't have the debris coming out without the conjunction of the Class II and the Class III components coming together, and it's that friction that causes it. So it would be irresponsible to say, well, either way, only the liner caused the metal debris, or only the cup caused the metal debris, which is another thing that we'd like to point out. Hold on. Judge Greenway's got a question. Sorry. Thank you. John, I want to get a response first. As far as that goes, since the MBA, the SBCA, the SBSE are all focused on safety, wouldn't you have to look at one of the state requirements of the SBSE? Wouldn't that mean you have to look at the class III rather than Class II? Okay. You know what? I'm going to take a crack at repeating what I think you said, because when I said we're getting about every third word, it's as if you were speaking into a fan and it's chopping up your words a little bit. So what I think I just heard you say is if you're looking at something where some parts are reviewed under Class III and maybe some under Class II, wouldn't you take a look at that component that was reviewed as part of the Class III and credit the government with that higher level of examination? Did I get that right? Is that the nature of the question? Okay. Okay. So like we said in the briefs, when the reason for the rule dissolves, the rule dissolves. If we're not dealing with a whole device, then there's no need for a preemption here. I think it would be equally fair to say that why don't we apply, because two of the components were Class II, why don't we say it's all Class II components because it was never reviewed by the FDA? That's the whole article. Let's talk then about the reason because Husky and LaFontaine, not only do they, those courts, not address the definition of device, which is defined to mean components and parts, among other things, but they also don't talk about the consequences for off-label use. And so can you address that because to the extent that part of the statutory and regulatory scheme is to protect the medical provider community in its off-label uses, but also to provide protection in terms of what goes back to manufacturers for that off-label use and encourage innovation that way, why wouldn't it further the purposes of the statute to interpret the term device and apply the express preemption provision to a component part that has been approved in its design, has been approved as to its labeling, and is then put out into the stream of commerce or looking at it another way, is the theory of liability or setting aside preemption as you would have us do, does that mean that for off-label uses that are then taken by medical providers, that liability comes straight back to the manufacturer for those off-label uses? And that, thanks for the question, that kind of gets into our argument that if preemption fails, that there's still a very preemptive effect. We still have parallel claims. It wouldn't be that if it was preempted, they wouldn't be able to argue that we didn't mark it this way, we didn't tell doctors to use it that way. They wouldn't lose their defenses because the device was used in an off-label manner. They had nothing to do with it. And our parallel claims are that they promoted this use to doctors, physicians, through their marketing, through their selective release of information and the like so that doctors would use it in an off-label way, and that would violate the regulations of the FDA. Well, I understood it. Sorry, Joe. Want to try again? Go ahead, please. Sorry. Well, you're talking about different claims, and maybe we need to better understand the nature of your claims because those that relate to the third amendment complaint, I understand you're making arguments about the promotion of off-label uses, and you have authority to support the notion that those are parallel claims. Those are not preemptive under the express preemption provision, even taking into account the express preemption provision. But you've also raised on appeal your objections to the rulings on the second amendment complaint as to, for example, negligence, negligence per se, strict liability, breach of implied warranty, and to the extent those go to the part, the labeling of it, the design of it, why wouldn't those claims, if allowed, impose a different requirement under state law than what has been approved by the FDA as to the requirements of the minor within the resourcing device? Yeah, I'm out of time. Do you want me to brief you? Please, yeah. I'm willing to bet that both of you are going to be up there longer than the time limit. Okay. Well, what I would say is when we make the appeal as to all of the claims, it's on the assumption that we just think there is no preemption. I'm certain that in our briefing it sort of articulates which ones we believe survive preemption and which don't. We believe that the parallel claims are more in the nature of if there's preemption of the entire device, it would be more in the nature of the failure to report, the failure rates of the device, because the liner had been used in hip replacements across, you know, more than just with Mr. Schucher, and we claimed it wasn't reported and it might have led to less. How could the failure, how could, help me out with this, I'm having a little trouble. I can understand the assertion that, wait a second, that manufacturer can't seal itself off and say, hey, we had no idea that there was going to be off-label use. If one accepts, you know, your argument that you had adequately pleaded facts that would give rise to an implication that they were in on that off, encouraging that off-label use, but how do any of the other claims survive express preemption if we accept the other side's argument that the R3 liner is the device at issue? I mean, if that, I'm not saying that is however, I'm just saying accept that for purposes of my question. If we thought the R3 liner was the device, what do you have left other than the claim in the third amended complaint that says, hey, they encouraged off-label use? I mean, you've got a fraud claim and a loss of consortium, you can set those aside. Well, that was a long question. No, I was processing. I think it's a good question, though, and the promoted off-label use is like several things, because if you look at the statute, mislabeling and misbranding is pretty broad. It includes giving scientific information and studies that are incomplete. It includes the general promotion to doctors as incomplete. So it's a whole range of activities. But fitting in that category. It can't include a failure of implied warranty, though, and it can't include a negligent design, and it can't include strict liability. Those things are, no matter how you want to frame them, you can't tease a parallel state claim out of those. They're just, if we sent the R3 liners, those are gone, right? I think I agree. The only other thing I would say that we would say remains is that the FDA requires them to report adverse events since they were deemed to be adverse events, and that's agreed in our papers. Those are also claims that we believe would be parallel that's provided, but I agree you couldn't. You can't attack the design. Assuming now for a moment that we agree with you and that the R3 liner isn't the device, the device is the whole hip replacement that went into Mr. Schuchat. Even if we were to agree that there isn't express preemption, does that mean that you can, you're free to pursue liability against the manufacturer? Or are there other kinds of preemption, other preemptive screens in place, like an implied preemption or a conflict preemption that would prevent you from making that kind of claim? Even if it doesn't fit within the meaning of the device there, it's still running up against this great, vast statutory and regulatory edifice that the federal government has set in place. I mean, as we understand it, there wouldn't be any kind of limits. And that's the last two devices that don't go through the rigorous process. You're free to do whatever you would like to do with the labeling, promotion, things like that. They don't have to seek prior approval, which is why we think, you know, even if the liner had all these requirements or claims against the components, and they could have put on the shell, on the ball, some other additional warning telling people not to use it with a metal liner, because when you're looking at an R3 shell and an R3 ball, I think it makes some sense that someone might try to use it with an R3 metal liner. Well, you just said it would be like a 510K, but why wouldn't it be something, I mean, you just, I think, expressly disclaimed that idea that it's a 510K. At some point, you indicate this is a Class II device that came out in a 510K, but then other places you say, and seem to say pretty expressly, this is a hybrid device. It's not fish, it's not fowl, nobody ever looked at it. In that context, you need to have a conflict preemption problem, because you don't have any root that's laid out. You're just trying to create a new root for liability, and there's this big regulatory thing out there that you've got to get past. I don't think so. Not that I think you put it out. I don't claim that it's a 510K. It's some kind of extra device that didn't undergo a kind of review. As you talk about device, we have documents that seem to indicate that the different components that went into the replacement system received 510K approval per component. But in some other courts, for example, in Virginia, in Eastern District of New York, the court is describing the entire system as being 510K approved. Which one is it? And do we have something in our record that states specifically whether we should be looking at the replacement system and the entirety of all those components together as something that is 510K approval or we've got multiple individual parts that have been brought together, one of which also has to be part of the resurfacing system that are being implemented at this point? I think with the 510K components, it's likely I can't think of exactly where it would be in the record received. Something that the R3 system we used in the replacement was went through the 510K process and just as in the TMA process, you can supplement it. And over the years, it was supplemented with parts. And all made of different materials but still similar to something that's already on the market. So that's what happens with 510K processes. They just have to demonstrate that it's something that's similar to an existing product on the market. And then with the VHR system, the cup and the ball was approved and the lead aligner that we're talking about today was subsequently approved. Your answer is that the replacement system is what was originally at the entire system? Yes, that's correct. Thank you. I have a question for you. I have a question for you. On the VHR system, you said on the first basis, in the competition, that this is a bad to medical device as far as creating competition. Okay. Joe, I hate to interrupt, but it might help, and it'll be awkward, but it might help if you spoke more slowly because what's happening is the mic is cutting in and out. It's like there's a delay, so it misses the first part of your word. So if you can just speak a little more slowly. I think you told us you wanted us on page 18 of this brief. I got that far. Okay. I believe this is O2. And my question is, you said on the first basis, you said that this is a bad to medical device, and on the first basis, you said that this is a bad to medical device as far as creating competition. Okay. And my question is,   and on the first basis,  on the first basis, you said that this is a bad to medical device as far as creating competition.  you said that this is a bad to medical device as far as creating competition. Okay. I think from the end, I understood the context of the question. So if I didn't understand it, I'll be happy to try to answer it another way. But when you read these cases, these cases do ultimately decide that there's significant preemption here. But what we're talking about in the cases that are cited is when you look at the components that are involved, they are all actually part of a Class 3 device. There's not a situation like in our case where there's a majority Class 2. There's Class 2 components and a Class 3 that become, so everything should get Class 3 here, but the VASPR striker, its hip replacement system, that they incorporated some kind of new liner, but they got that use approved. And so that's why the whole device is treated as Class 3. It's something that used to be 510K, but they actually brought it into the system as Class 3. They asked for the approval. So what the plaintiffs tried to argue in that case was, well, one of the parts was Class 2 initially, so you can't really treat this as a Class 3 device. But the court said you have to look at the whole thing that's placed into the person, the whole device, and here the whole device was approved. And all those cases, one way or another, have a similar kind of logic to them. There's another case, there were several cases involving the bone graft system, and that one surgeon would put in the whole Class 3 device, but instead of an anterior approach, they would do the superior. I forget what the terminology is for the approach, but you're still dealing with a whole device being used. You're not dealing with some hybrid component. And Aaron versus Medtronic, which is one of those bone grafts, took a very similar approach to their component of the Class 3 device that was used off-label, and the court did look at the individual component. Right? That was Southern District of Ohio. It treated the individual component, then it was treated in its off-label use, and especially preempted looking at the definition of device and statute. Again, the whole- I think, I believe in that case, I don't remember that one, but most of the bone graft cases I looked at, there were several, was maybe they would take out a piece from the Class 3 device, but everything put into the person was still approved for a Class 3 setting. It's not like it's in this case where you have a mixed match of components. There's objectives that are all FDA approved. That's the thing that I'm trying to focus on. I need you to focus on there all being FDA approved devices, and I guess the implication is the R3 liner was FDA approved as well when it was approved for use in the BHR system, so why isn't that an FDA approval that raises express preemption? Because I believe in those line of cases, it's an FDA approval of the whole thing that's inserted into the person, and in our case, there was not FDA approval for the whole device that's inserted into the person, so the rationale for preemption disappears. The reason the FDA has it is because if someone gets a device approved, if it's used as intended, there should be preemptive effect in that case. What if the FDA assumed that they had brought in this other liner, that it was exactly a system that had been approved, and had been approved as a Class 3 device after all the many hundreds of hours described in the report, and in putting it in, by accident, one small screw fell out and wasn't actually inserted. Would the lack of that screw then cause you to say, wait a second, that's not an FDA approved device any longer. It's not the device that was approved by the FDA, so since it's missing a component, express preemption doesn't apply. Could you argue that? I mean, it's not the screw would be a different component? The screw is missing. It's not in there. So now the device, in a sense, is different than the one the FDA approved. Could you argue, well, we have a state law claim now for negligent design, for breach of express warranty, et cetera, and strict liability, because it's not the device as the FDA approved it. Would that be a tenable argument? I think the way I would see that scenario is that if a device is missing, it would probably still be preempted. Preemption because of the screw and just part of it? Yeah, exactly. It's just part of it. That's the point. So you acknowledge that if there's a part missing or there's something different, that doesn't necessarily mean it's not preempted, because you can have some differences and still have preemption. That's what I hear you answering. If that's true, the question becomes how different is too different, right? Well, the thing is, I get where your question is getting at. The screw, I see it as like if the cup had a dent in it and that's a manufacturing defect, I don't see it as the screw as a component. Your question is, I see it as if it's like one component, but all the other ones were correct, except for this one that might have not been from the system. Then, yes, the visual question, I think that, again, there wouldn't be preemption. It would collapse. It's not used exactly as intended, the reason it collapsed. It is not used as intended. You get your parallel claim if, for example, it's been manufactured or packaged or stored or legally distributed or advertised in some way inconsistent with the requirements imposed by the FDA. But if it's being used in a way that's different, how would that be recognized as parallel? That takes us back to operable use. Whatever we want to call this kind of preemption, right, at its heart, where we've got an area that's subject to this kind of intense federal regulation, we want to ensure that there is not a conflict between the requirements that are imposed on a manufacturer by the agency and state law that might impose something different. So, if what you're suggesting in being able to bring a claim for a different actual use, you're suggesting that there could have been a different label on it that should always be in conjunction with some other device, those are things that would then impose a different requirement than the FDA imposed on that component part in a program. Doesn't that take us, again, whatever kind of preemption we want to call this, doesn't that take it back into the world of preemption? The thing is, though, just because preemption doesn't apply, doesn't mean that we don't depend on what happens. So, the reason that this preemption does not is because when something is used exactly as intended, there shouldn't be liability that comes from that. So, when something is not used as exactly as intended, I think the reason for it is the rules of law. That's where we see the patient here. And when I say used as intended, I mean like the exact device. If they use it on photograph cases and several of them at Alport Clinic in like a different surgical approach, that's still using the whole device. We keep coming back to references to the scope of the safety review and what is in the application, what the expectations are for, you know, off-label use as a result of the ACC approval. I'm wondering if we are making the argument to people that in many cases along these lines that are pending across the country without any courts of appeals having yet weighed in, we don't have input by the FDA itself. Would you have-is there any concern with the request from our court, for example, to the FDA to address such issues as the actual scope of their review and the dynamics of the application process? Yes. And plus, when we started doing discovery, we just received things from the FDA. I don't know if it's something that needs to go on. Maybe if we ask you to be a little more responsive. Okay. Question. So, question. So, please, this is Tony Flynn. I'm from the Office of Off-Label Promotion. This is Tony Flynn at Collectively Clinic, New York City. We want to not to tell that any FDA did not find it wrong. Since the doctor made the decision to use the R3 liner without the system, doesn't that contradict the manufacturer model? I'm not entirely sure. I understood his question to be, why doesn't the doctor's decision to use the R3 liner extricate the manufacturer from liability? In other words, not to put words into the good judge's mouth. So, why isn't that a supervening cause, an intervening cause that shields the manufacturer? We got that right? The Office of Off-Label Promotion did not find it wrong. Yes. So, he's saying, assume there wasn't off-label promotion. Why isn't the doctor's choice independently to make an off-label use? Why isn't that an intervening cause that just shields the manufacturer from liability? That's not what we allege happened here, no. Yeah, that's clear. But he's asking a hypothetical question. I would like an answer to it. No, I don't. Well, I think it would depend on the preemption argument. Something like strict liability, if it's preempted, those claims wouldn't exist. But there's some claims that would exist and there's some claims that wouldn't. So, just take the use of the device. Leave preemption aside. Leave off-label marketing aside. Just assume that they had put something on the market to be used specifically, as they said, and a doctor chose to do something different with it. Isn't that a complete defense for the manufacturer? If there's preemption? Preemption for the side. This is not a question about preemption. It's a straight-up court question about intervening at sufficient cost. No, because if they put a product out on the market that's unsafe, does that become their strict liability? Strict liability, even if it's used in a way that the manufacturer didn't put it on the market for. I mean, by definition, this is not something that they put on the market to be used in the way the doctor did. Yeah, that would depend on what the case lines and all that are having to do with it. Could I briefly, like a minute, address the jurisdictional issue? Yeah, that's true. We haven't had a chance for you to quite ask a question or, I mean, make a point about Smith & Nephew TLC. So take it away. We'll give you a couple minutes. Yeah, it'll be very quick. Our position at the district court level is that they own, TLC owns the trademark. They spend millions of dollars in research and development. You can see that on their website. They hold subsidiaries, boards. We've read all that. Do you have anything to add to your brief? Just the legal part of the affidavits are not entitled to the weight of that discovery and to the district court. Why not? Why are they not entitled? You may be right that you should have some discovery, but when you say they're not entitled to the weight of that discovery, what's your authority? I've seen the briefing, and it's odd that the representative is thinking that the affidavits aren't to be considered, because his language is vague on behalf of the public. He basically sided with what was in the affidavit instead of taking what we believe is truly necessary. Isn't that our case? You rely heavily on Gale, but that second district New York case takes a different approach than we do in our circuit and looks only to the party's allegations. In our circuit, in Jammus, we do accord weight to a record that's been developed on the connection jurisdiction. So, in light of that, given the extent of statements that are actually agreed upon by parties, how is there a kind of painstaking stream of commerce, just an alter ego relationship, either of control or agency, even as they contested statements? One of the issues was we couldn't reach without any discovery at the lower level. If you're spending millions of dollars on research, you only own the security, you launch the system, you withdraw the system. It was pretty clear that they were directing this product to the United States and that's when we were able to reach the limits of what we were proposing. Any other questions, Judge Greenaway? No, thank you. Just a couple on the third amendment complaint and the pleading issues. We require a particular defraud, it seems to be said in particularity, but also as to your promotion of off-label use claims. We need facts to be alleged, not simply legal conclusions as to causation. Where in the complaint, what can you point us to that is actually an actual allegation, and something sufficiently specific, particularly a defraud law, that survives even for the promotion claim to be put aside in line B and that sort of thing to be required there? Well, I think that it's ultimately whether a claim is plausible. I think that in this case we presented facts. Mr. Shuker was planted with a series of complaints that wasn't a one-off. When you look at worldwide, most of the people that used that metal liner were using it in the way that Mr. Shuker used it. Now, that's either coincidence or it comes from some intentional promotion by the manufacturer. Well, we can't directly speculate about that, and there's off-label uses that are made all the time, that's understood and in fact protected in statute. So, we need for causation some specific facts alleged as to doctor's knowledge, not in a conclusory way, but some factual allegation that could establish an inference of causation. The doctor wouldn't say, wouldn't propose or speak to his patients about why he selected the product as generally or general knowledge in the world. I think these devices are promoted heavily to doctors, not promoted to the end user, they're promoted to the doctors who get them to patients. So, we produced the amount of facts that we properly could. When you look at the surgical notes, it says, I chose the metal-on-metal system because it's good for active patients like Mr. Shuker. And at the pleading stage, we think it's properly pled allegations that are to be accepted. So, the version of events where they promoted the type of surgery that Mr. Shuker underwent with those particular components, we think is to be believed at that stage. And requiring on X day, Mr. Shuker, X person went to Dr. Tarafenko, isn't the level of specificity that's even possible in the world. Your assertion is the notes are close enough of a parallel to things that Smith and Nephew said in other contexts to indicate he had read and was paying attention to them. Is that it? Well, I don't know about those specific things. There's an allegation. That's what you say in your brief. Not just that in particular, but if you read like the second or the third minute complaint, it doesn't say just in the launch or in the withdrawal. You say that in the way that they marketed it and the way that they got it. I can't point to anything specifically, practically just because it's not something that's publicly available. What I can- Well, I thought the best argument would be for the brief, when you quote President Kennedy and the sentence on the end of the letter, the way- No, no, I'm sorry. Right. It's only- It's only a particular- It's only a part of it. Yes, yes. I mean, the press release and then there would be other materials as well that we allege. But, yeah, we would allege that the press release itself, the way it's presented- What you're saying is from what you're able to say from the press release and other materials you believe exist, that informed what the doctor said, and that's proof that he was being encouraged. Is that correct? That's fair. Okay. All right, thanks. We'll have you back on rebuttal. And Mr. Lange? Hold on just a moment. Yeah, right. We're going to take just a moment and see if we hang up on Judge Greenway and call him back, if we won't get a better connection. All right? So I'm not sure how long. Do we need to take a recess? Yes. All right. All right. Just work through your recess. You can keep eating. Thank you. Do we need all of them? You can probably get them together. It's been an appeal for two years. It's like no one ever had to really do much about it. It's a house. It's a house. Yeah. It's a house. Yeah. It's a house. Hello? I think you're on mute. Okay. I took it off mute. Oh, you sound so much better. Can you hear me now? Yeah. Okay. All right. I'll let the judges know that we've... First, how do I sound? Sounds all right? You sound fine. Are you pressing the button? No. Okay. I don't want to press the button. I want to just be in the middle. I'm not pressing any buttons, Judge. Okay. Can you just hear the judge? All right. Let me... Yeah, I do. Let the panel know that we're ready to go, I think. Okay. Okay. All right. Okay. Please be seated. We have everybody on the screen. There he is. Can you hear me? We can hear you now. You sound so much better. Yeah. All right. Great. As soon as the intro has happened, I have a question. Okay. Go ahead.     All right. All right. All right. All right. All right. All right. All right. All right. All right. All right. All right. So we have a question. All right. Ready to go. So look, wonderful. I'm so happy to be here. So let's sort of start off where we ended with your adversary on the press release. They allege several facts that they think amount to off-label promotion. But let's just start with the press release, if you would. When I look at the February 27th, 2009 press release, it's clear that there's some excitement about the R3 Acetabular. Am I pronouncing that word correctly, Acetabular? Yes, Your Honor. Okay. So the press release talks about the R3 Acetabular system, and in the second paragraph there's specific discussion of the metal liner as it was presented in the BHR. But clearly the rest of the paragraph isn't talking about the use of the R3 metal liner in the BHR. It's the potential use in the R3 Acetabular system. So my question is, why wasn't this press release enough to establish that S&M was engaging in off-label promotion? I don't think that that's what the rest of the second paragraph says, Your Honor. I think that what this says on its face, it first of all discloses, quite frankly, in the first sentence of the second paragraph what the regulatory status is, which is that it's approved for the Birmingham HIP resurfacing program. It then goes on to talk about how there's a ceramic liner option for the R3 system, and what the district judge focused on in his September 2006 order as well is that the R3 Acetabular system is here advertised as a hip replacement and a resurfacing system, not just a hip replacement system. And what we don't have knowledge of is what the resurfacing aspect is. That's what the judge focused on here, is that it doesn't say whether you're talking about the R3 system as a hip replacement system or as a resurfacing system. And my question to you on that very point is, when it says including metal on metal, what would be the metal on metal in a hip resurfacing? And as I look at this, if I'm understanding what's been presented to us, the metal on metal would be the femoral hip with the R3 metal liner, and that would be the metal on metal that we're familiar with in the R3 Acetabular system. What would be the metal on metal in a hip resurfacing? Well, certainly in the module, in the DHR module itself, that is metal on metal. The cup or the shell and the metal liner, both of which, by the way, are approved through the PMA process, that is metal on metal, the DHR module. No, but I'm so sorry. You said that what the reference to the metal liner is with regard to the R3 Acetabular system. I'm familiar with metal on metal in that instance with a hip replacement. You mentioned it could be resurfacing. And if this reference to metal on metal is resurfacing, how does that come about? I understand how it would come about in a hip replacement, but I don't understand in a resurfacing. I'm not sure, but I think you might have those reversed. It was approved, if I remember correctly. It was PMA approved in the DHR system, which is a resurfacing. Correct. But it was never, and nobody disputes that it was never approved for use in the R3 Acetabular system for metal on metal. That's undisputed, right? Right. If I understand what Judge Greenaway is getting at, it is the fact that you got it approved in one setting, that is for resurfacing, how does that make it okay for you in this press release to start talking about it in the context of hip replacement, which is not hip resurfacing, and talk about it in the context of the R3 Acetabular system for which it was not approved? That is, you focused on a bunch of other stuff, but he's trying to get you to focus on it. I would love to hear you say, what is the meaning of this? It is the only acetabular system, speaking of the R3 system, available to surgeons that accommodates the major advance bearing options, including metal on metal. If you haven't gotten that metal on metal approved as part of the R3 Acetabular system, what does that sentence mean? If not, hey surgeons, you can use this and you're good to go. Thank you. Understood. It does not mean that, because this is talking about... Who could a reasonable jury think it means that? Because we're at the motion to dismiss stage, right Mr. White? I understand. Well, actually on preemption we're on summary, Judge Greenaway. Depending on how this is coming up, if this is off-label promotion, it's motion to dismiss stage. And right on the face of this, it says what it is approved for, the regulatory status. It has never said... You do have a bunch of other stuff in there. The question isn't could you make an argument to a fact finder what does this mean? The question is, is that sentence in there such that a reasonable fact finder could say, no, we think you were promoting this, and we think you should be responsible for promoting this. Or is there something about that press release that's just so clear that no rational person could look at that and think it's off-label promotion? That's the standard you've got to meet, right? I think that no rational person could read this as a whole. I believe that. It says on its face, Your Honor, that it's only approved, its regulatory status is only approved for the Birmingham hip resurfacing program. And then you go right into the next sentence, which is also about the approval of a ceramic liner option. You talk about the R3 system, and then you then talk about this being the only acetabular system available that accommodates metal-on-metal. What else could it be referring to is the question? Well, as I say, in the module, in the BHR module, it is metal-on-metal. The cup and the metal liner is metal-on-metal. True enough. Yeah, but we're not talking about BHR. This is clearly talking about the acetabular system. And since we are on a motion to dismiss on the off-label promotion claim, that's I think what Judge Jordan said is exactly how I would frame it. So I'm not going to try to reframe it. I just would like a response. I believe that the metal-on-metal is talking about or should be taken to mean that a metal liner and the R3 acetabular shell, which is 510, it's a component for the 510K. If that were so, why would you need to tell anybody that now? Wouldn't that be no? I don't understand why that particular fact would be misrepresenting. Why is there any reference at all to the replacement systems? If the announcement on what is really being approved and is being introduced to commerce, at least in the United States, is the metal liner option for the resurfacing system. But repeatedly throughout, including in the headline, the opening sentence, it's announcing the introduction of a metal liner, defining the system in question as one used in tip replacement and resurfacing procedures. And specifically calling out the R3 acetabular system. Yeah. That's in the first sentence. Well, my answer is that the first paragraph mentions it. I don't want to just keep talking past each other, but my answer is that the first paragraph talks about tip replacement and resurfacing, so it's not limited simply to replacement. The second paragraph clearly disposes its regulatory status. Well, one thing I think you can say for sure is there's nothing clearly about this press release because if there was, you know, we probably wouldn't be having this discussion at all. But either way, I think we're going to be in a loop now where you can say what you need to say, which is an interest in compliance. Obviously, this is clear. Nobody could mistake it. So why don't we, if it's okay with Judge Greenway, I don't know, there may be a follow-up. Okay. Let me ask you this. Moving to the questions about preemption. Before we get to the point of pleading, on condition, on the specificity of pleading, by at least paragraph 90, where they relay Dr. Fitzgerald's info, either read the press release or was it garrisoned? Why isn't that? Are you in the third? Are you in the third? I'm so sorry. Yes. The third or the second? Third. Thank you. Why isn't that? Only as a causation. It's a causation allegation. Okay. Well, I would start, of course, back where we just ended, which is that I don't think the 2009 press release is an off-label promotion. But if you're assuming it is and we're just to the causation allegation, I think it is speculative and it seems, in fact, to be at odds with the theory that they don't have enough facts to know whether he read or not. I think it's speculative. But I will say the district judge in that dismissal order did not do the dismissal on causation, as you know. He noted the lack of causation allegations in the Second Amendment complaint, but in the September 2016 dismissal order, his focus was just no plausible allegations of promotional help, of promoting off-label use. He did not dismiss the lack of causation. Let me ask you this question to follow up on that. If we look at paragraph 90 and if you read the press release in the manner that your adversary does, why isn't that enough on causation? That he read it? Well, I guess the question is, and maybe you can answer this, how else would a doctor know that you could use the R3 metal liner in the R3 acetabular system other than knowing it from being manufactured in this way? Well, I think that many doctors innovate on their own. I can't speculate how he would know that, but I think there is a lot of innovation going on with off-label use that has nothing to do with being promoted. Listen, we're dealing with plausibility here, right? That's the standard we've got to deal with. Could it be more plausible that, as Dr. Pirofanko says, this is a good metal-on-metal solution, not because he's been sitting around in his basement thinking, I wonder what kind of liner would be good in a different place, but because the manufacturer of the system that he's using has said, hey, you could use this R3 metal liner in the R3 acetabular system, which is why we call it the R3 metal liner. Okay, I have a few answers to that. First, I think it's much more plausible. I don't think that's plausible at all. And this is an A726. Okay, before we get to that, let's have a short question. Why would you call the metal liner for the BHR system the R3 metal liner, linking it by name to the R3 acetabular system? If you didn't want doctors to have that linkage in their mind, what is there about the name R3, which seems completely arbitrary, that makes it a sensible name in the BHR system, except for a desire to link it in surgeons' minds to the R3 acetabular system? Well, I think there are a number of answers to that. And the FDA has approved that name as part of the label, so that's part of the scope of preemption. But your direct question is, why would you name it that, if it doesn't have anything to do with the R3 system? And I wasn't privy to why this was named the way it was, but we do know that overseas this metal liner has been used in some locations. But precisely, doesn't that indicate that Smith & Nephew didn't want surgeons thinking about using it? They named it that because they intended for it to be used in that way, and in fact other parts of the world did promote it in that way. So it's hardly surprising that a surgeon in the United States would see the R3 metal liner and think it could go with the R3 acetabular system. I mean, why isn't that plausible when it comes to causation? Especially in light of the press release. No, I don't think that that's a fair inference, given the actual warnings. All of the literature that has actual warnings on it, very clearly warns that this did not be used for the R3 acetabular system. So the Surgical Technique Bulletin, which is Exhibit D to our expert Dr. David, repeatedly, and sometimes in bold, says you cannot use this metal liner with the R3 acetabular system. I, by the way, am well past my time. I think it's pretty clear we're off the clock, right? This is an important case, and we have a lot of questions. Okay, then with my colleague's indulgence, I would like to move to the questions. The first question I've got for you on this score is, you know, I'm a little curious about that. I had kind of thought about this MBA construct as maybe having a series of screens, you know, that there could be expressed preemption and then implied preemption, and just because you've got one, you've got two, you've got a third. Maybe I'm thinking about that wrong. If you lose on the expressed preemption argument, if we were to accept about the expression that R3 liner would never be MBA approved, that it was not a device in the sense that it got approval, would you then throw your hands up and say, well, I guess it picks up on substitute liability under strict liability theory, or could you mount an implied or a conflict preemption argument? Obviously, none of this has been briefed below, and the judge hasn't reached those issues. I think you could raise an implied or conflict preemption. How would that work? In answering that, keep in mind, if you would, Mr. Astrochant, the assertion that no, no, there is no implied preemption because the whole system provides for a 510K kind of non-preemption. You can bring claims without worrying about that, so there's not another level of preemption. Well, it clearly is not a 510K device as a whole. It's not a 510K device that was actually implanted, so I don't think that answers the question because they did use the R3 metal liner, and as I've said before, the shell itself is PMA-approved, and I think that's important. But you're going to have two PMA-approved components in a mix-and-match device, and I think clearly that's expressly preempted under 360K, but if it were not, I still think that allowing state tort law to infringe on the FDA's regulation of the usage of components, the R3 metal liner and the acetabular shell, both of which are PMA-approved, brings you into conflict or implied preemption. I don't think this is very well developed in the law, I must say, because I think that so far in these components cases we are seeing express preemption. Well, clearly not all of them, right? You lost on LaFontaine, somebody else took a beating in Husky v. Zephyrcon, but the logic specifically takes on the argument that you've made of rejection. So there are judges out there looking at what you're saying about express preemption, and they're not buying it. Well, I would say this to that. Husky is a much different factual case. It is a much different factual case, but it speaks specifically to this setting. I mean, the judge in Husky goes out of his way to talk about this case, and your very capable district court judge quotes in his footnote 17 at some length language that bears repeating from that case, quote, Just as a device receiving premarket approval cannot be separated into its component parts to avoid application of express preemption, a device receiving 510K approval cannot be separated into its component parts to create express preemption. I mean, the logic of that is infound. What's wrong with that? Well, it assumes. I mean, the thing that's most wrong with it is it assumes the R3 metal liner is a component in the 510K. He spoke about it in terms of 510K, but why isn't the logic just as applicable in the terms of the 360K setting? That is, you can't assume that a system that is approved as a system would be approved piece by piece by piece. There's no logical reason to assume that because the FDA says, I like the way this works together, it would then say that each individual piece could be taken out and used in any way at all, and it's can they approve. I think I can bring us back with that final comment. That helps me bring us back to what I think we ought to focus on, which is that the FDA doesn't regulate uses. So the FDA isn't going to make a comment about what use. It regulates devices. It doesn't regulate uses because it doesn't want to trample surgeons' abilities to make off-label uses. It does regulate warnings and labels. Then to the extent they use the word use and that led us astray, let's go with devices. This has got to be about, on the apprehension point, it's got to be about what is a device, right? The very question we're wrestling with is what is the device? You say it's the R3 liner. They say that is not the device. The device that was tested by the FDA and received PMA approval was the DHR resurfacing system. Not the R3 liner, but the DHR resurfacing system. That got PMA approval. So how do you get from the system that got PMA approval to each individual piece that got PMA approval so anything, any place that that piece appears is shielded from liability? Multi-layer answer to that. First layer is just the definitions, and you go to 3.21, which defines the device as including its components. So we talked about that, Your Honor. Krauss, you talked about that when a colleague was up here. The definitions themselves include components within the device. By that definition, right down to the minutest screw could be PMA approval. That every piece, every small tiny component is then a device in and of itself, even if the FDA never approached it in that way. They only approached it as a whole. That's the legal argument they're making. I think you can take it to an extreme like that screw where it may not. But this is clearly a discrete component, and, in fact, we know that because it was separately approved. It was separately approved as a component in our case, in our facts. It was a line supplement. It wasn't the original device that was tested. It was brought in as a line supplement to the DHR system, but approved as a component line supplement after the fact. So you could at least agree that the fact that something is a component is not in and of itself enough to say that it is PMA approved, that the system is approved. I mean, once you say, yeah, you could take it to a point where it doesn't make sense, each individual screw, then you start talking about degree, right? Yes, Your Honor. Okay. All right. So you have to hang your hat here in saying this is not a degree too far because this was approved as a line supplement to the DHR system. That's what makes this a separately approved device. Well, I certainly think that is true in our case. I mean, I would say, though, that had it not come in as a separate line device, I think it would get PMA protection, even if it was an actual component of the original device that was approved. I think that the liner is not so far down the continuum of being, you know, a millimeter screw. You're referring to the line item. Sorry. Thank you. Does that mean that every component of every device that has or achieves a PMA, when placed in any other system, now controls, and you would say that in any of those instances, that separate system should have preemptive effect or there should be a preemptive effect on that system? Yes, but for these reasons. My yes would be if the component was installed in that system off-use by a surgeon who is using the component off-use, and then the later allegations, Your Honor, in whatever lawsuit we're talking about down the road,  you can imagine situations which are much unlike this one, where what is being alleged in that lawsuit has nothing to do with the off-label use component. Okay, so on that point, perfect point, so here's the question. Here, right, it's a combination of a class two and a class three, right? In the R3 acetabular system, when you introduce the metal liner, all the other components are class two. You're introducing the metal liner as a class three. Presumably, if your adversary was standing next to you, he'd say that the injury occurred because of the intermingling or the working together of a class two and a class three device. So does that mean any time a class three is introduced to a system, any kind of system, class one, class two, that automatically it gets class three treatment because of the introduction of that component? If that is what the problem is, if the problem is the class three component, I think it gets preemptive protection, and here we know that the problem that's been identified throughout through court complaints is a metal-on-metal articulation, and, you know, originally that seemed to be the femoral head and the metal liner. That seemed to be what the theory was as this case moved through the district court. In the recovery, the theory seems to have changed to be, or at least supplemented to be, the metal liner and the acetabular shell, the cup, and it's that contact that is talked about in the recovery. I want to emphasize both of those components are PMA approved. The problem here, I think hypothetically, I'm trying to test the limit of the breadth of what you're arguing for here. The breadth of what you're arguing for is any component of a PMA approved device is itself PMA approved and therefore cannot preempt any cause of action associated with that thing. That's the argument that you're making, right? Yes, sir. Okay. Imagine an FDA approved device for radiation therapy, and it consists of a nuclear material and some kind of core dispensing mechanism and a computer that allows you to target where it's going and dispense that nuclear material. And that's FDA approved. It goes through the PMA process very rigorously. Your argument would mean, then, at that point, that the FDA has approved nuclear material for every- that there's no- that any place or use of nuclear material is subject to an express preemption. If somebody took that nuclear material and put it to a completely inappropriate- put it in a different product, like they made an R3 liner out of uranium, the fact that they had it PMA approved in this other system would mean it's a component that's beyond the reach of any other kind of a flame alarm. Is that the right way to look at this? It is. But let me add some things which I think may help you look at it that way, and that is, undoubtedly, there would be warnings and labeling, don't do that. FDA would require you to have warnings and labels saying, as to that component, don't do that. That being what you just laid out as the awful use. At that point, the policy question that Congress is facing and has done a balancing on is, should the manufacturer bear the brunt of off-label uses made by other people, surgeons, when it comes to these medical devices, when what is being manufactured is being manufactured for a particular on-label use, and that's what it's approved for, it gets moved over, and it gets used off-label because of a surgeon's choice. Congress has made the determination that we are not going to step on physicians telling you to do that, but we are not going to hold manufacturers liable when they do that. I'm a little surprised you're going down this road, because when we're talking about an express banshee provision, why is our focus on whether it's central, or what's the problem in a later claim, or looking at the evolution of the problem into generic materials? I think the preemption provision in question says that no state or political subject establishes human-effects-related devices intended for human use. Any requirement which is different from, or in addition to, any requirement applicable under this Chapter 2 device, and which relates to safety or effectiveness of the device. Why doesn't that answer the question of how we inform the scope of what is granted? I think it does. I think the plain language of the statute has a very broad conclusion. It doesn't talk about, it says nothing about off-label uses. Congress knows about off-label uses, because it has protected the ability of surgeons in 396 to do off-label uses. It knows that concept. It has incorporated it in the 360K preemption provision. But I guess the point is that this preemption provision doesn't seem to be so broad. How is the way this is written completely different than the way in the law we would describe contract preemption? I think it's very broad. I think that the plain language is that it preempts any state law that would require anything different from what Congress has required, and Congress has given this a broad preemptive scope. I'm sorry. I can tell I haven't answered your question. Well, it preempts what is different from or in addition to a requirement that has been imposed by statute or the regulations and relates to safety or effectiveness of that device. Right. So, why do you think that could be a codification of our concept, a concept project? That is, looking at the particular claim, would it impose a requirement that is different than what was imposed by the FDA, which, for example, does not seem to apply to steel, as this is a product made out of steel, and, therefore, every time steel is used in any device, it somehow transports or transmits its responsive status. But that wouldn't seem to have occurred unless there's something quite unique about that, so that a claim being brought would impose a different requirement that's related to safety or effectiveness of the original device. I think this was approved and has to be manufactured. The FDA requires that this is manufactured exactly as it was submitted for approval. So, the fact that it gets imported into a different device by a surgeon, there is nothing the manufacturer can do about that, and that's why the scope of the plain language of the preemption has to be broad enough and is broad enough to cover that component, that device, wherever it is used off-label, so long as it is manufactured and labeled and worn as the FDA said it had to be.  Oh, I'm sorry. Did you have a follow-up? Go ahead, Judge Greenway. I can hold on to it. So, here's my question to you. I seem to think your preemption argument depends on two things, and I want to sort of test that for a moment. Let's assume for a moment that we disagree with you on your off-label promotion point, and we think that it's been sufficiently tried to go forward. Let's also assume for the moment, when I talked to you before about the crux of the claims claim, you said that it focused on the introduction of the R3 metal liner. Suppose we view it slightly differently and we say, no, it's not the R3 liner. It's the introduction of the R3 liner, or it's a combination of the R3 metal liner with the femoral head, or whatever you say the theory has now progressed to. Keeping those two things in mind, I presume at that point you concede that preemption wouldn't preclude suit and this lawsuit should go forward. No, I don't concede that on either point. Let me start with your off-label promotion assumption, and I don't believe that stating a claim for off-label promotion affects the preemption aspect of this case. There is one, we talked about it. Well, a moment ago you talked about the manufacturer, and I just mentioned that to say that the manufacturer couldn't come to the table essentially with clean hands, because if you assume that there's enough to go forward, well then at least there's been enough asserted to say that the manufacturer had some role in the doctor's decision-making and the availability of the R3 metal liner to be used in the R3 acetabular system. Yes, Your Honor. And, I mean, the basic premise of your question is that the off-label promotion claim is going to go forward. That's your assumption. And so what I'm asking, or what I'm talking about here, is what effect does that have on the preemption? Yes, go ahead. Okay. I thought that was where you were trying to get me to go. And off-label promotion, I very strongly urge this. There's one straight case, the Ramirez case from Arizona, but other than that it's pretty much uniform that off-label promotion is a parallel claim. It's not an automatic out of preemption altogether. It assumes that preemption is in place, and then it states a parallel claim. And it is not that if you find off-label promotion there is no preemption in the first instance. It states a parallel claim. So your assumption is that you're going to let a parallel claim or off-label promotion claim go forward. That's just a step away. I would urge you not to do that. But given that assumption, I can't disagree with that assumption, but I don't think it changes anything else in this case as to upholding the dismissal of the strict liability, the summary judgment on preemption. Right. And then on your second assumption, which was if we assume there's more going on than just the arc-free liner, I'm happy for you to assume that there's interaction. You know, if you assume there's interaction with the femoral head, if you assume there's interaction with the acetabular shell, still the arc-free metal liner is central to the allegation. There are no allegations that despite its presence, something else is wrong with this mix and match. The question is not whether it is central, but whether allowing the court liability in that situation is going to impose a requirement on the approved component that is separate from or in addition to the requirements that have been imposed by the FDA, and it can't be changed without further approval by the FDA. Maybe that's the way we should be thinking about what's preempted, given the terms of the express preemption provision, which may not be so different than the way we would approach conflict preemption as well. And it would allow, under that assumption, it would allow a strict liability, a defect claim, warranty claim to go forward against this arc-free metal liner that has been approved and must be produced the way that the FDA says. So the manufacturer had no control over how this surgeon uses this off-label, and it would clearly run into the preemption provision as a matter of policy. And I want to, before I finish this, I will sit down and not point you to page 409 of the transcript below, the summary judgment hearing below, but my, not my colleague sitting here today, but his colleague arguing that was put this question by the district judge. The district judge asked my colleague that if you put the idea of off-label promotion to the side, that if Smith and Nephew promotes this the way, they don't promote any off-label uses, they put that idea to the side, wouldn't you agree that if the surgeon reaches up on the shelf and grabs this arc-free liner and uses it in this system that he used it in, that in that circumstance, with no off-label promotion claim, doesn't that have to be preempted? And on page 409 you'll see the answer was under that limited factual scenario, which I don't believe we had, I would pack up my bags and go home. So what you're saying is the door only swings one way. You said in your brief, this is a quote from page 22 of your brief, you're discussing the non-presidential opinion of this court from a couple, three years ago, Smith v. DeQuay Orthopedics, and you say, this court based its reasoning in part on the proposition that a device that received premarket approval cannot be separated into its component parts to avoid application of express preemption. That's what you say is sound law, but you're saying that the flip of that is not true, that you can indeed separate the device that was used into its component parts in order to create express preemption, right? We can't promote that. If that happens, we shouldn't be liable for it. You can't promote it, but you can separate out the device that was actually implanted in somebody into its component parts in order to create an express preemption. I believe that those components, absent any sort of illegal promotion, are all protected with the 360K preemption. Yes, Your Honor. You had referenced before on the idea that as a line item in the supplement, the liner itself is going to be approved. I just want to make sure we understand the record correctly, because the premarket approval supplemental application seems to be talking about a metal-on-metal cup, an RO3 isotabular shell, and a liner assembled through a locking mechanism. And with further description as to what the supplement is covered, is there some place that the liner alone in isolation was approved as a line item? I think those components together on the S006 supplemental line, Yes. Yes, I believe those components were submitted together and approved together. Can you also address, in terms of just clarity of the record, whether the 510K approval was given to the replacement person in its entirety or only to the individual component part? I believe, and I think the district judge believes, if you look at his footnote on this, I believe it was done as component parts. Is there anything in the record you can point us to to clarify that? Because other courts described the system as full, as the 510K approval. Again, just informing how we're supposed to conceive of what is the device here. I cannot do more standing here than he does, the district judge does in his footnote, where he explains why he thinks it's a series of components. It's in the March 31st footnote. Footnote 6. Also, the Act of Davis, that was submitted by your client, say that such an FDA should be marked as involved in a line item as well. Yes, sir. Without distinguishing between U.S. and other jurisdictions. The FDA's response to the print footnote said there was never a U.S. recall from the particular nephew in 2012. The call was limited to what is outside the United States. Again, in the record before us or the district court, is there anything that says definitively which is accurate? Was there a recall from the U.S. or was there not? I don't believe the record definitively answers that. I actually am in a position to tell you what happened if you don't mind me doing that. I mean, I don't think the record clears that up definitively based on the pages that you mentioned, which I think is page 847 is the FDA response, and I think page 845 is the notice of voluntary withdrawal. So, the FDA response is there. Is that accurate? Is that something that we can rely on or is there something else we can be able to control or discard? I don't know. There certainly, I mean, you can rely on the fact there was an international market withdrawal. Including from the U.S. market? Again, this is not clear in the record, but Smith and Nephew withdrew from all markets at that time. I can tell you that. I'm sorry. That's not clear from those two documents. Those documents, I think, would indicate that it's an international withdrawal and not domestic recall. Now, I need to also be clear that there was no recall. Recall has a very distinct meaning in the FDA. This was a market withdrawal, and I know the district judge uses the word recall, but this was a market withdrawal, not a recall. I had asked one of your colleagues on the other side of the aisle about requesting an answer from the FDA. There are issues in this case. Do you have any objection to making such a request? I certainly wouldn't object to the court doing that. The court thinks that would be helpful. I think the case can be decided without it, but I certainly wouldn't object to that. Matt, is one of your arguments that you just put aside preemption for a moment, that the plaintiff can't make out claims on a device that the manufacturer did not create? I thought that was the hypothetical that you raised before what you were saying, but I just wanted to make it clear. I'm sorry. I did not follow the question. No problem. Let's put preemption aside for a moment. And I want to know if one of your arguments is if you put preemption aside, we should still prevail because the plaintiffs can't make out a case when it is the doctor who is essentially creating an intervening cause by choosing to introduce the R3 metal liner in the R3 acetabular system. I think that would vary by jurisdiction, and honestly, I can't tell you for sure what Pennsylvania law is. Intervening cause and misuse, obviously, are defenses that can be raised. Different jurisdictions will allow those to be raised at different points in time. It would be misuse or an intervening cause defense, but I am not prepared to say for sure that on that ground that this could be affirmed as a matter of law. The judge never got anywhere near that. I think this could be defended on intervening cause and misuse grounds if we ever got that far, but the judge only meets the preemption issue, the district judge. All right. Yes. Yes, thank you. Thank you. Thanks very much, Mr. Lang. Ms. Gourley, your four minutes. Thank you. Thank you for your indulgence, and we would ask you to go forward. Good afternoon. At this point, your honors, I am Sarah Gourley from the City of Austin in Chicago, and I represent Smith & Nephew TLC. I actually, at this point, don't know that I need my four-minute absent questions. I think that my colleague on the other side stood up and said it is pretty clear that Smith & Nephew TLC is the third-tier parent of Smith & Nephew Inc. It is organized under the laws of England and Braille, and I just failed to make a prime patient case of jurisdiction under either their stream of commerce or alter ego theory.  I think it is fair to point out that Smith & Nephew products don't materialize in the United States randomly. There is a parent company. It is located overseas. It does desire to market in the United States, and it does, indeed, market product from the United States, and it is perfectly foreseeable that those products will be in the state of Pennsylvania. Therefore, at a minimum, we should have an opportunity on the plaintiff's side to get in there and take some depositions and find out exactly what the corporate structure is so we can understand who the responsible parent company is. I take that to be an argument. The district court's analysis of this in total is plaintiffs have not made such a showing, unquote, that is, a showing of a possible existence of requisite contacts, which, of course, looks like a conclusion and not analysis. Why don't they get discovery? Your Honor, if you look at the record at pages A349 to A344, you will see an oral argument on this issue. The district court did ask questions about the supposed jurisdictional contacts and went into some detail about what the plaintiff had and had not shown with respect to all of their submissions, most of which they got from annual reports. The sort of things that they could get without discovery, right? None of which even rose to the level of creating an existence of possible jurisdictional contacts. Is the BHR system and its counterparts manufactured in the United Kingdom? That's an allegation. The BHR is manufactured in the United Kingdom by a separate Smith & Beckham subsidiary which does not mean in this lawsuit. Of course, how would they know that? Well, they argued it in their reply brief, Your Honor, so they do know it. How would anybody know it except by your assertion, and how would it be subject to testing without discovery? Well, they have product labeling, Your Honor. They have information from the Smith & Beckham website, which they rely on, and if you look at the jurisdictional discovery which they proposed at 607.630, it's essentially what this court called a fishing expedition in the Eurofins case. It may be, without getting into the weeds on whether a particular interrogatory or request for admission is good or not, on the broad question of whether somebody is entitled to find out about the corporate structure of an entity which is sending products into the United States, I'm left to wonder why we're not in a circumstance where our own prior law tells us that, for those who put it, jurisdictional discovery should be allowed unless the plaintiff's claim is clearly frivolous. That's the law. If their claim that there's control from the United Kingdom by a corporate parent, clearly frivolous. Your Honor, if the mere allegation, which is all we have here, is sufficient, then there would be jurisdiction over any company anywhere. It's not a mere allegation. It's a logical conclusion that this is a subsidiary, which you admit, of a company in the United Kingdom which is sending stuff into the United States. And we provided, as Judge Cross pointed out, affidavits with respect to the activity in the United States and with an FUTLD, none of which is corrected at Pennsylvania. So my question to you is, if it's enough for the defendant who has the information to say, we'll tell you what we want to tell you and you don't get to hear anything else, isn't that an unfair advantage for a defendant in saying, well, you can't touch us because we've got the info and we're not sharing it? No, Your Honor. The plaintiff has, in fact, attached a large number of evidence and, in fact, relied in part on the affidavits that we submitted, suggesting that certain paragraphs of the affidavits established a kind of control that would support their alter ego claim. Once you come forward with affidavits, doesn't that indicate, or shouldn't that indicate to the district court, there are facts here in dispute and that's the point at which traditionally we let some discovery take place to test facts. It's not a system usually where one party gets to say, this is the way it is, and the other party doesn't get to pass assertions, is it? Well, Your Honor, the facts that were relied upon were, in fact, understated by the plaintiff, but they relied on a number of them, and this circuit, in fact, has denied a jurisdictional discovery in a number of cases when the plaintiff only shows a possibility of maybe there's some jurisdictional contact and it does not allow fishing. I think one of the facts that was apparent here is that one of the press releases pertaining to both the launch and the withdrawal of the R3 metal liner had persons referred to for follow-ups as PLC employees. I mean, that seems to be right in the heart of the matter here. That press release, Your Honor, was issued by Smith & Nephew Inc. It did have the Smith & Nephew PLC ADR stock ticker on it, and it did have one potential contact with a Smith & Nephew PLC employee as a possible contact. Why is it a fishing exposition? Why would it be a fishing exposition then? Because, Your Honor, that is not the kind of systematic contact directed at a particular jurisdiction that would allow a court to assert personal jurisdiction. When you take that fact in tandem with the fact that the R3 metal liner was developed in the U.K., PLC is located in the U.K., is this really the stretch that you're talking about? I think it is, Your Honor. The plaintiffs failed to make even a prime fishing case of jurisdiction. All right, thank you. And we do look at the specific allegations where there's, and that's to say, while within our circuits we allow the consideration of the record to that extent, that often results in additional facts in the record that are not disputed and that allow a decision to be made. But it appears that some of the particular points where there's simply contradictory assertions in the affidavits and the complaints include whether PLC was involved in designing, developing, testing, marketing, et cetera, the R3 Aquabular System, whether PLC and its executive officers were actively involved in running Smith & Nephews and by selling the R3 system in the state of Pennsylvania,  regarding such products as these are in the R3 system. So we have those specific points of disagreement that are set up by the affidavits on the one hand and the allegations on the other. Wouldn't at least some narrow discovery on those contested points be appropriate? Your Honor, I don't think so in this instance, and in particular a number of those points which may have been conducted. If you look at the plaintiff's brief, they now concede, for example, that the DHR system was not manufactured by PLC. So I don't think... They may agree that it's manufactured by PLC, but I don't think they conceded those other points which you just heard Judge Krause mention, which I think come from paragraph 4B of that complaint where it says they were involved in the designing, the developing, the testing, the assembling, the promoting, the labeling, the packaging, the advertising, the marketing, the distributing, the selling. I think you'd disagree with that, but they've alleged that. And again, that's usually where we say there's a disagreement. You have a little bit of discovery, isn't it? Well, Your Honor, I think it's perhaps in some instances, but in this instance they had a large number of documents in the exhibit. They did research about the exhibit, and that's when they attached those documents. They are unavailable because they're... Because they're public information, and you've got some information about your company that they would like to get at that perhaps is not public information. Your Honor, I would then again suggest that under your precedent, in your own testimony, that the kind of discovery they are looking for here is nothing more than a fishing expedition to try to create a record that doesn't do that. All right, thanks very much. Your Honor, I appreciate it. You're good. Three minutes. I think we've had folks, I'd like to get their input out there. I just wanted to point out that on page A14 of our brief, they discussed the surgical technique for the EHR. There's a surgical technique for the R3 on page A14, and it doesn't contain any warnings at all about not using it with a metal liner. I just wanted to point that out. As far as, again, the issue of whether the liner is at the heart of the claims, there's been no expert reports on, or even a deposition with Dr. Karafenko on the degree. Is it more from the liner? Is it more from the cup? Is it more from the test? Something that should be accepted as true, that it's all the components are sprinkling away, I would say, because there's no definitive proof that it was only the liner. That's something that would have to be borne out. I mean, even so, given the claims that you are raising, aside from the promotional claim that you had brought me, how would those claims not include some requirement that was different or in relation to the requirement that was by virtue of the FAA's approval of the metal liner as is within the resurfacing system? What would those claims require to be different? What are you suggesting in negligence per se, in strict liability in the quality that would be required? Sorry to interrupt. The cup and the ball don't have any CMA approval. They could have made those devices safer so that you would not have used it with the preempted component. That's why it makes a difference which components are not CMA approved. So you're now saying that your claim of negligence, implied warranty, et cetera, go to the other part and not to the metal liner? It's to all the components. We made claims against all the components, I believe, in the second amended complaint and the third amended complaint. We don't just say the liner caused this or did this or the other. It's the different components, all that claims against them when used in tandem. Well, in the third amended complaint, those are not in the mix. The three claims that you made are the ones that the court permits you to make. But in the second amended complaint, perhaps that's true. Would you have any objection to supplemental briefing on the question of implied and conflict preemption, which was, as Mr. Lange pointed out, not something developed alone, but how that might interact with expressed preemption, which was extensively argued, that is, informing and educating the court on whether there is any such thing as implied or conflict preemption that would exist independent of the expressed preemption? We'd welcome it. The court needs to inform its decision whether we supplement our briefings. All right. Mr. Lange, would you be all right with that request, too? If that was the report. It appears I'm out of time. Do you want me to just wrap up? Yeah. If you've got a sentence you want to wrap up with, wrap up. All right. I just ask that the court reverse and prevent further proceedings. Thank you very much. Okay. Thank counsel very much. We know we took a half hour, then turned it into two hours. But we're grateful for everybody's time. We'll see you tomorrow on your case. You've got under-advice. It's just work.